UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>        Plaintiff,<br>        v.<br>ISAI ULISES VILLAGOMEZ,<br>        Defendant. | Case No. 18-cr-00599-VC-1<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**<br>Re: Dkt. No. 49 |

      This is a fairly close case. The defense is correct that the evidence presented by the government in support of its assertion that a police canine detected the odor of drugs in the defendant's vehicle is not reliable. Indeed, the evidentiary hearing raised serious questions about how the San Francisco Police Department is using drug detection dogs. However, the facts known by the officers by way of the confidential informant and their own observations before the dog allegedly detected the odor were sufficient to establish probable cause to search the vehicle for drugs. Accordingly, the motion to suppress is denied.

I

      Officer Elmore had a longstanding relationship with the confidential informant. Elmore knew that the informant had worked actively and consistently for multiple drug interdiction agencies in the Bay Area over several decades, conducting many drug transactions and helping build cases against many defendants. Elmore had never seen or heard of credibility or reliability problems with information the informant had provided to officers over the years. Nor did the evidentiary hearing give rise to concerns that the informant had ever given officers bad information in the past.

During phone calls the night before the search, and additional calls and a face-to-face meeting the morning of, the informant told Elmore and Special Agent Cahill that: at least one man, possibly accompanied by either a second man or a woman, had traveled from San Diego to the Bay Area to sell 1 kilogram of heroin; they were staying at the Inn on Folsom in San Francisco; they were prepared to conduct the transaction with the informant at the hotel; and they were driving a white Chevy Malibu.

Based on this information, Cahill and an SFPD officer made a plan to watch the informant make the deal with the suspects. The informant would tell the suspects that he did not have the money with him and that they should follow him in his car to get it. At roughly 11 a.m., the agents saw two suspects parked outside the hotel in a white Chevy Malibu with paper plates—one in the driver's seat and one directly behind him in the back seat. The informant then entered the car on the front passenger side and spoke with the occupants. Then the suspect who was sitting in the back seat of the car got out, went into the hotel, came back with a black bag, and returned to the back seat. After a brief period, the informant exited the car, got into his own car, and drove away. The suspects followed the informant in their car, with one person driving and the other remaining in the back seat.

The combination of the informant's information and the conduct observed by the agents was enough to establish probable cause to stop the suspects and search the car for drugs. It's true, as the defense emphasizes, that Elmore and Cahill did a bad job in their interactions with the informant. In particular, neither of them questioned the informant about his connection to the suspects and how he came to learn that they had traveled to San Francisco to sell a kilo of heroin. This could be fatal to the government in a case where the agents were less familiar with the informant, where officers were unable to observe conduct that corroborated the informant's account, or where there was an innocent explanation for the conduct observed by the officers. *See e.g., United States v. Freitas*, 716 F.2d 1216 (9th Cir. 1983). But here, although the informant's account was somewhat sketchy, he was well-known to the officers, and they observed conduct that strongly corroborated his account. Indeed, it is difficult to conceive of an

innocent explanation for what the suspects were doing. The most likely conclusion from the facts described above—by far—is that the suspects were engaging in a drug deal. And once the suspect in the rear of the vehicle retrieved the bag and brought it into the car, there was probable cause to believe that the drugs they planned to sell were inside the car.

At oral argument following the evidentiary hearing, defense counsel urged the court to disregard all the testimony by Elmore and Cahill based on the declarations they submitted in opposition to the motion to suppress. It is true, as the Court explained more fully at the hearing, that these declarations include details (ones that appear for the first time in an attempt to bolster the government's probable cause argument) that are of questionable veracity. The U.S. Attorney's Office (which no longer relies on those details) should do some serious archaeology on how they found their way into the declarations it helped prepare. But the record on these details is not clear enough to support a conclusion by a preponderance of the evidence that they are intentional falsehoods. And the remaining facts discussed above gave the officers probable cause to search the vehicle.

II

The government contends that probable cause is bolstered because a police canine detected the odor of drugs in inside the car after the suspects were removed but before the car was searched. However, the evidence presented by the government in support of this contention is not reliable. Thus, if the probable cause analysis from the preceding section were erroneous, the Court would grant the motion to suppress.

As established at the evidentiary hearing, drug detection dogs are trained to take a definitive and objectively discernible action once they've identified the source of a drug odor—for example, staring at the source of the odor or sitting down at the source. This was described by the government's witnesses as a "final response."  Sometimes, however, the dog's handler will develop a belief that he can subjectively recognize that the dog has detected a drug odor even when the dog has not taken the discernible action it was trained to take. The handler will develop this belief based on a "behavior change" such as a show of excitement or a sudden movement

(for example, in this case, a sudden jerk of the head).

The Ninth Circuit has held that a finding of probable cause is not precluded simply because a canine's "alert" came from a behavior change rather than a final response. *United States v. Thomas*, 726 F.3d 1086, 1098 (9th Cir. 2013). A handler deeply familiar with the dog's behavior might, depending on the evidence, draw a reliable conclusion about a dog's behavior change. Perhaps on occasion this could itself establish probable cause. Or more realistically, perhaps it could combine with other facts to establish probable cause based on the totality of the circumstances.

But the evidence presented at the hearing demonstrates that courts should be far more suspicious of a behavior change than a final response. Typically, drug dogs receive meticulous training—through tests involving real narcotics—to help ensure the reliability of the final responses and to minimize the risk of false positives. That training typically takes place with the handler, to assess the effectiveness of dog and handler as a team. Even after the dog is certified for drug detection, it will receive regular "maintenance" to confirm that its final responses continue to be reliable. But from the evidence presented at the hearing, it appears that the training, certification, and maintenance (of the dog and of the handler) is typically limited to assessing the reliability of a dog's final response. It does not typically include any testing for whether a behavior change identified by a handler is a true indicator of the presence of narcotics. The handler's conclusions about the meaning of the dog's behavior change are entirely subjective, and the reliability of those conclusions are apparently not put to the test. As defense expert Andre Falco Jimenez reliably testified, this raises serious concerns about the validity of testimony by a handler that their dog exhibited a behavior change. Did the dog jerk his head because it detected a faint odor of narcotics? In response to a noise? Because of the sudden smell of meat? Some other stimulus? Absent some independent verification of the reliability of these subjective assessments, it will often be difficult to credit testimony by a handler that a dog's behavior change created probable cause to search for drugs.

There is a further problem. Narcotics dogs are typically trained to detect four controlled

substances, without distinguishing among them: Cocaine, heroin, methamphetamine, and…….marijuana. Of course, marijuana possession is now legal in California. Anyone who regularly strolls the streets of San Francisco would be surprised not to encounter the smell of marijuana with the same frequency (probably greater) as the smell of cigarettes. And a dog's sense of smell is far more sensitive—by orders of magnitude—than a human's. So when a narcotics detection dog is sniffing around a car on a busy street in San Francisco and merely exhibits a behavior change rather than sitting in front of the car or staring at the car, you'd be forced to wonder if it detected the odor of narcotics in the car, or the faint odor of marijuana from one of the countless people in the vicinity who could be carrying or smoking it. Moreover, even if the dog is detecting the odor of narcotics in a car, what are the odds in the typical case that it is something other than an amount of marijuana that people are legally entitled to possess? *But see People v. Vansteen*, 2020 WL 772512, at *2 (Cal. App. Feb. 18, 2020) (rejecting an argument that an alert by a marijuana-trained dog could not support probable cause, apparently without considering the possibility that the average person is far more likely to possess a legal amount of marijuana than they are to possess a substance like heroin or methamphetamine).[1]

    The facts of this case raise many of the concerns referenced above. The canine, whose name is Cooper, is a certified narcotics dog. He has undergone extensive training. And his handler, Officer Healy of the San Francisco Police Department, has kept "maintenance" records for Cooper. But there is no reliable indication, from any of the evidence presented at the hearing, that anyone has tested the reliability of Cooper's behavior change (a sudden head movement), as opposed to merely testing the reliability of his final response (staring at the source of the odor). There was, in short, no evidence to alleviate the very serious concerns about false positives.

    With respect to the incident in question, the body camera footage shows that Cooper

---

[1] In this case, of course, the officers already had reason to believe that heroin was in the car, so if you could conclude that the dog alerted to the smell of narcotics emanating from inside the car, you would have reason to believe that the narcotic he smelled was heroin. But as discussed below, the evidence does not support a conclusion that the dog smelled the odor of narcotics emanating from the car.

spent a good deal of time sniffing all around the car—including near the rear door with the open window—without exhibiting any discernable sudden head movement. This lasted for approximately one minute. Then, at a point where the footage was not showing Cooper, Healy can be heard announcing a behavior change in front of the door with the open window. Given the general concerns about the reliability of behavior changes, the specific concerns about whether Cooper's behavior changes were ever tested for reliability, and the nature of the body camera evidence, the government has not met its burden of showing that Cooper detected the odor of narcotics emanating from inside the car.

III

The motion to suppress is denied. A further status conference will take place on Wednesday, September 15, 2021 at 2:00 p.m. via Zoom.

**IT IS SO ORDERED.**

Dated: August 13, 2021

_____
VINCE CHHABRIA
United States District Judge